**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Eva Grigsby,

        Plaintiff,                          Case No. 20 C 67

v.                                          Honorable Jorge L. Alonso

La Rabida Children's Hospital, *et al.*,

        Defendants.

## Memorandum Opinion and Order

Plaintiff Eva Grigsby brings this action against Defendants La Rabida Children's Hospital ("La Rabida"), Tim Meline, and Linda Robinson (collectively "Defendants") for violations for the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1981. Defendants have moved for summary judgment on all of Grigsby's claims. For the reasons stated in this Memorandum Opinion and Order, the Court grants Defendants' motion for summary judgment [82] in its entirety. Civil case dismissed.

### Background[1]

### I.     Northern District of Illinois Local Rule 56.1

Before providing the case background, the Court first addresses the Northern District of Illinois Local Rules on summary-judgment motion practice. In their response to Grigsby's

---

[1] The Court particularly cites Grigsby's response to Defendants' statement of facts (Dkt. 101) and Defendants' response to Grigsby's statement of additional facts (Dkt. 112), where both the asserted fact and the opposing party's response are set forth in one document.

Statement of Additional Facts, Defendants argue that Grigsby's Local Rule 56.1(b)(2) response to Defendants' Statement of Material Facts violates the Local Rules. (Dkt. 112 at 1–3.)[2]

Under Local Rule 56.1(e)(2), "A response [to a statement of material facts] may not set forth any new facts, meaning facts that are not fairly responsive to the asserted fact to which the response is made. A response may not assert legal arguments except to make an objection, including objections based on admissibility, materiality, or absence of evidentiary support." N.D. Ill. LR 56.1(e)(2). Local Rule 56.1(e)(3) further provides, "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact[.]" N.D. Ill. LR 56.1(e)(3).

Grigsby's Local Rule 56.1(b)(2) response to Defendants' Statement of Material Facts is replete with extraneous matter, legal arguments, and improper record citations. Grigsby's response includes numerous facts that go far beyond Defendants' factual assertions; those facts belong in her Statement of Additional Facts. *See Levin v. Grecian*, 974 F. Supp. 2d 1114, 1118 (N.D. Ill. 2013); (*see e.g.*, Dkt. 101 ¶¶ 16, 19, 24, 25, 26, 27, 35, 37–40, 41, 45, 46, 50, 61, 62).[3] Grigsby also repeatedly includes legal arguments that are inappropriate for a Local Rule 56.1(b)(2) response. *See Phillips v. Quality Terminal Servs., LLC*, 855 F. Supp. 2d 764, 771–72 (N.D. Ill. 2012) (disregarding facts containing legal conclusions); (*see e.g.*, Dkt. 101 ¶ 25 ("Disputed. Plaintiff concedes that she was disciplined but maintains that the reason for such discipline was due to her age and/or race.") (citation omitted)). Finally, several of Grigsby's responses to Defendants' Material Facts either cite evidence in the record that does not actually controvert the relevant factual assertion or fail to cite any evidence whatsoever. *Boyd v. City of*

---

[2] The page numbers in docket citations are taken from the CM/ECF header, except when the Court cites to deposition testimony, in which case the Court will cite to the internal transcript page and line number.

[3] Grigsby, nevertheless, fails to include most of these extraneous facts in her Statement of Additional Material Facts. (*Compare* Dkt. 101 ¶ 37 *with* Dkt. 112.)

*Chicago*, 225 F. Supp. 3d 708, 715 (N.D. Ill. 2016) (disregarding factual assertions that failed to cite the record or misstated the record); (*see, e.g.*, Dkt. 101 ¶¶ 25–26, 44, 55, 57, 59, 60, 67, 75). Accordingly, the Court deems Defendants' facts to which these improper responses are directed admitted.

The Court further notes that Grigsby's Statement of Additional Facts is also deficient. In a non-movant's statement of additional facts, "[e]ach asserted fact must be supported by citation to the specific evidentiary material" and "should not contain legal argument." N.D. Ill. L.R. 56.1(b)(3); L.R. 56.1(d)(2), (4). In several of her factual assertions, however, Grigsby either did not cite any record evidence or cited record evidence that does not support (and even contradicts) her facts. (*See e.g.*, Dkt. 112 ¶¶ 11, 14, 29, 30, 33.) The Court therefore disregards those factual assertions as well.

Given the Court's findings on Grigsby's failure to comply with Local Rule 56.1, the following background is based only on the facts that are properly before the Court.

## II.     Summary of Material Facts

Having addressed the Local Rule 56.1 issues in Grigsby's summary-judgment briefing, the Court turns to the underlying events of the present action. Plaintiff Eva Grigsby is an African American woman who was a respiratory therapist at Defendant La Rabida Children's Hospital from 2008 to 2019. (Dkt. 101 ¶ 3; Dkt. 112 ¶ 2.) Grigsby was 58 years old at the time of her termination from La Rabida and she worked the night shift—her preferred shift—while employed at La Rabida. (Dkt. 101 ¶¶ 13, 63.)

La Rabida is "a private, non-profit organization . . . that specializes in caring for children with chronic illness, disabilities, or who have been abused." (*Id.* ¶ 2.) Many patients at La Rabida are children suffering from asthma and other chronic pulmonary conditions, and the hospital

employs respiratory therapists, like Grigsby, to provide breathing treatments to these patients. (*Id.* ¶ 12.) Respiratory therapists are responsible for administering respiratory care to patients, including ventilator support, and they must administer treatment plans in consultation with physicians and pursuant to prescription. (*Id.* ¶ 14.) Further, respiratory therapists must follow La Rabida's ventilator management policy when using mechanical ventilators, and all settings entered into a ventilator must be approved by a doctor's orders. (*Id.*) Respiratory therapists are assigned to care for several patients per shift, and if a patient is on a ventilator, the therapist must document the ventilator settings and the patient's response to the ventilator every four hours. (*Id.* ¶ 15.) There is also a "recall button," which permits therapists to copy the ventilator information entered by a respiratory therapist during a previous visit if the doctor's orders, ventilator settings, and patient's oxygen saturation content have not changed; the therapist must, however, first check the doctor's orders to ensure they are being properly implemented before using the "recall" button. (*Id.* ¶ 16.)

Defendant Linda Robinson was a respiratory manager at La Rabida from 2011 until 2022. (*Id.* ¶ 4.) Robinson is an African American woman who less than one year younger than Grigsby. (*Id.* ¶¶ 3–4.) Robinson's job responsibilities included "supervising the respiratory therapists, evaluating their performance, providing feedback and coaching, and performing patient care as needed." (*Id.* ¶ 19.) As Grigsby's supervisor, Robinson conducted Grigsby's performance evaluations, and ultimately made the decision to terminate Grigsby. (*Id.*)

Defendant Tim Meline was La Rabida's Employment Manager in its Human Resources Department ("HR") from 2009 until 2022. (*Id.* ¶ 5.) Meline is a Caucasian man. (*Id.*) Meline's job responsibilities included "recruitment, employee relations, administration, and managing various programs like workers' compensation, unemployment, and tuition reimbursement." (*Id.*

4

¶ 20.) Meline "worked with La Rabida's department managers to ensure that they were following the Hospital's policies on disciplining employees." (*Id.*) Although Meline did not make the decision to suspend or terminate Grigsby, either he or his boss, Frances Lefkow, needed to approve the decision. (*Id.* ¶ 21; *see also id.* ¶ 20 (describing how HR was not involved in issuing written warnings or suspensions, but HR must approve all terminations, and Meline would review suspension notices with the relevant department manager and present them to the employee).) Meline was not involved in the day-to-day operations of La Rabida respiratory therapists. (*Id.* ¶ 21.)

### a. 2016 Conflict between Grigsby and Robinson

Grigsby alleges that she and Robinson had a contentious working relationship, stemming from an incident that occurred in 2016. On July 29, 2016, Robinson gave Grigsby "Charge Therapist" duties, which meant that Grigsby had the authority to give other respiratory therapists shift assignments. (*Id.* ¶ 22.) Robinson subsequently discovered that Grigsby had given a "low census" shift (a shift which allows a respiratory therapist to take the day off if there are not many patients) to a particular therapist when Robinson had approved a different therapist to be next in line. (*Id.* ¶¶ 22, 25.) Grigsby and Robinson discussed the matter in Robinson's office, and Grigsby accused Robinson of treating the dayshift better than the nightshift. (*Id.* ¶ 23.) Grigsby's accusation made Robinson angry, and she allegedly began yelling at Grigsby. (*Id.*) Grigsby's age did not come up during this meeting. (*Id.* ¶ 24.) On August 3, 2016, Robinson disciplined Grigsby for the incident. (*Id.* ¶ 25.)

Grigsby subsequently reported the incident to Robinson's supervisor, Pat DiFiglio, who met with both Grigsby and Robinson in mid-August to resolve the matter. (*Id.* ¶ 26.) Grigsby also sent DiFiglio an email, requesting that a mediator be present during any future meetings

with Robinson because of Robinson's alleged behavior during their prior meeting. (*Id.*) Grigsby did not raise any race or age discrimination allegations at the meeting with DiFiglio and Robinson. (*Id.*) Although at the end of this meeting, Grigsby and Robinson agreed to put the conflict behind them, Grigsby claims that Robinson continued to treat her differently based on her age and in retaliation for the aforementioned incident. (*Id.* ¶ 26; Dkt. 112 ¶ 6.)

### b. Age-Discrimination Allegations

Grigsby argues that Robinson harbored age-based animus against her, as demonstrated by her differential treatment between the dayshift and the nightshift. According to Grigsby, Robinson favored the dayshift based on Grigsby's belief that the dayshift was younger than the nightshift. (Dkt. 101 ¶ 68.) Grigsby claims that Robinson required the nightshift to work past the end of their shifts more often than the dayshift did as the nightshift had to transport patients being treated overnight to other facilities in the early morning hours when dayshift workers were arriving at work. (Dkt. 101 ¶ 69; Dkt. 85 at 187:9–15). Grigsby, however, conceded that dayshift therapists had responsibilities that nightshift therapists did not have, such as clinical duties. (*Id.*) Grigsby testified that she had no firsthand knowledge about the performance of dayshift employees. (*Id.*; Dkt. 85 at 53:8–12.)

Grigsby alleges that Robinson also made age-related comments. Specifically, she claims that Robinson called her and other older employees on her shift, "senior therapists" and "the Golden Girls," in reference to the sitcom starring four older women. (Dkt. 112 ¶ 6.) According to Grigsby, the use of the word "senior" was a reference to their age, (Dkt. 85 at 69:11–16), although she testified that she had more seniority than many of her co-workers in the department, in addition to being older. (*Id.* at 69:17–20.) In the context of Robinson referring to Grigsby as one of the more "senior" employees in the department on an annual performance review,

Grigsby also conceded that the term was related to her seniority. (Dkt. 101 ¶ 34; Dkt. 85 at 112:19–113:2.) With respect to Robinson's "Golden Girls" comments, Grigsby interpreted Robinson's the reference be negative. (Dkt. 85 at 70:25–71:3.) She was unable to state how many times Robinson referred to her as a "Golden Girl" and contends that she was "just named that." (Dkt. 112 ¶ 6; Dkt. 85 at 69:9–12.) However, she never reported Robinson for making the above comments. (Dkt. 85 at 70:25–71:4.)

Grigsby testified that Meline did not discriminate against her based on age. (Dkt. 101 ¶ 74; Dkt. 85 at 94: 10–12).

### c. Race-Discriminations Allegations

Grigsby claims the Meline discriminated against her based on her race. Mainly, she alleges that Meline "refused to allow [her] to see any reported complaints about her, refused to allow her to receive a copy of her employment file and refused to allow [her] to plead her case with regard to suspension and/or termination." (Dkt. 112 ¶ 8; Dkt. 85 at 91:13–93:15.) She also claims that Meline refused to address her complaints about her fellow co-workers and that he once called her into his office to ask about a report another employee made about her. (Dkt. 85 at 88:5–24, 89:9–91:7.) Grigsby testified that she had a "gut feeling" that Meline committed the above acts based on race. (*Id.* at 91:13.)

Grigsby testified that she did not believe Robinson discriminated against her based on her race. (Dkt. 101 ¶ 65.)

### d. Grigsby's Job Performance

Grigsby's job performance is a key disputed issue between the parties. The Court first details La Rabida's disciplinary policy and then summarize Grigsby's disciplinary record from 2016 to 2019 below.

### i. La Rabida's Coaching for Performance Policy and Grigsby's Disciplinary Record

La Rabida follows a disciplinary policy, the "Coaching for Performance Policy," which specifies how supervisors should proceed when disciplining an employee. (Dkt. 101 ¶ 10.) Under the Coaching for Performance Policy, supervisors are supposed to follow a four-step process. (*Id.* ¶ 11.) Step 1 is a verbal warning. (*Id.*). Step 2 is a written warning, providing formal notice of the problem and an agreement by the employee to correct it. (*Id.*) Step 3 is a formal notice that the employee has breached the agreement to correct a problem; this notice can result in the employee receiving a suspension. (*Id.*) Step 4 is a written termination notice. (*Id.*)

### 1. 2016 Incident

As detailed in a prior section, Robinson disciplined Grigsby in August 2016 for giving a "low census" shift to a different respiratory therapist that Robinson had not approved for the privilege. (*Id.* ¶ 25.)

### 2. 2017 Incident

On May 23, 2017, while Grigsby was serving as Charge Therapist, she incorrectly documented that there were two backup ventilators for patients, which Robinson discovered was untrue. (*Id.* ¶ 35.) Robinson subsequently informed Grigsby, who acknowledged her error. (*Id.*) Grigsby's error presented a safety issue because backup ventilators must be available in the event the primary ventilator fails and the failure to have two backup ventilators is a violation of department policy. (*Id.*) Robinson removed Grigsby as Charge Therapist due to this mistake, although Grigsby disputes that she was formally disciplined for the mistake. (*Id.*)

### 3. 2018 Incidents

On February 7, 2018, Robinson informed Grigsby via email that she had documented the incorrect ventilator settings for a patient during the entirety of her February 4, 2018 shift. (*Id.*

¶ 37.) Grigsby's response email admits that she committed a "human error" and states that she had used the recall button. (*Id.*).

Robinson responded on March 5, 2018, reminded Grigsby that using the recall button without checking the settings was dangerous, and gave her a verbal warning for the incident. (*Id.*; Dkt. 85 at 152.) Robinson also informed Grigsby that Robinson had discovered during a random quality check that Grigsby had failed to check on or give any treatments to a patient with a tracheotomy during her entire shift. (Dkt. 101 ¶ 38; Dkt. 85 at 152.)

On February 5, 2018, a mother of one of the patients whom Grigsby was treating made a complaint to Robinson regarding Grigsby's care of her child. (Dkt. 101 ¶ 39; Dkt. 78 at 126.) Specifically, the patient's mother stated that Grigsby had spent too much time complaining during her shift, as opposed to providing her child with proper care, and that when the child made a gurgling noise, Grigsby did not suction the child, and the mother was forced to suction the child herself. (Dkt. 101 ¶ 39.) The mother requested Grigsby not be assigned to care for her child anymore on the grounds that Grigsby was not competent at working the ventilator and suctioning patients. (*Id.*) Grigsby does not dispute that a complaint was made but argues that the parent's complaint was meritless. (*Id.*)

Robinson informed Grigsby of the parent's complaint and issued her a written warning, a "Formal Notice of Problem & Agreement to Correct" ("Formal Notice"), in accordance with Step 2 of La Rabida's Coaching for Performance Policy. (*Id.* ¶ 40.) The Formal Notice is dated March 10, 2018. (Dkt. 85 at 157.) The Formal Notice states Robinson will facilitate Grigsby's completion of a competency evaluation for the LTV ventilator and retraining on the Trilogy ventilator. (*Id.*) The Formal Notice further states that "Eva will refrain from caring for patients being ventilated on the trilogy until retraining is complete." (*Id.*) Above the employee signature

line on the Formal Notice, there is a handwritten note that appears to state, "Refused to sign." (*Id.*) In her deposition, Grigsby denied receiving a Formal Notice of Problem, but she testified that Robinson had instructed her to undergo a competency evaluation for the LTV ventilator and to complete retraining on the Trilogy ventilator. (Dkt. 101 ¶ 40.)

On March 20, 2018, Grigsby failed her LTV ventilator competency exam, and she was suspended with pay until March 23, 2018 so she could undergo a retraining on the LTV ventilator and retake the exam. (*Id.* ¶ 41.) On March 23, 2018, Grigsby passed exam. (Dkt. 85 at 176.) The parties dispute whether Grigsby was initially the only respiratory therapist in the department singled out to take the competency test, but eventually in April 2018, all respiratory care practitioners, including Grigsby, underwent mandatory training on the Trilogy ventilator. (Dkt. 101 ¶ 41.)

On March 13, 2018, Robinson placed Grigsby on a performance improvement plan ("PIP") to help her improve her performance in the areas identified on her 2018 annual evaluation where she was rated "Below Expectations." (*Id.* ¶ 43.) These areas were "Job Knowledge," "Work Quality," and "Patient Care." (Dkt. 85 at 170.) The PIP explicitly emphasized that Grigsby needed to work on her documentation skills. (*Id.*) In the column titled "My Plan to Improve," Grigsby acknowledged that she should not perform duties she does not feel comfortable operating, that she needs to check on her documentation, and that she will ask her co-workers for help. (*Id.*) Grigsby signed the plan, and Robinson agreed to reassess the PIP after six months. (*Id.* at 171; Dkt. 101 ¶ 43.)

On June 25, 2018, a therapist on duty informed Robinson that Grigsby had "failed to go on walking rounds when handing off patient care to the dayshift therapist in violation of department procedure." (*Id.* ¶ 44.) Robinson prepared a report called a "supervisor's record of

10

discussion" for Grigsby and met with her to discuss her failure to go on walking rounds; Robinson asserts that she followed this same procedure whenever she encountered someone not following procedure on walking rounds. (*Id.*)

On July 9, 2018, Grigsby failed to document a patient's ventilator setting; Grigsby could not recall whether Robinson talked to her about this incident but admitted that the documentation showed she had not input the ventilator setting information. (*Id.* ¶ 45.)

On October 4, 2018, Robinson and Grigsby discussed and signed her PIP. (*Id.* ¶ 46; Dkt. 85 at 199–200.) Robinson also left a note stating that Grigsby continues to have documentation errors and that extension of the PIP will not solve the problem. (Dkt. 101 ¶ 46; Dkt. 85 at 199.) Nevertheless, an October 15, 2018, email from Meline to his supervisor, Frances Lefkow, states that Robinson is going to extend Grigsby's PIP another 90 days. (Dkt. 80 at 135.)

During her November 6, 2018, shift, Grigsby informed the resident physician on duty that a patient's ventilator air pressure was on an incorrect setting and should be increased; the resident consequently increased the air pressure. (Dkt. 101 ¶ 47.) Four hours later, a doctor who was checking on the patient realized that the pressure was much higher than it should have been. (*Id.* ¶ 48.) Robinson testified that she believed this error was a "failure that could cause someone their life . . . . This is a breathing machine that supports the person's breathing. If the numbers are wrong, they don't breathe." (*Id.*; Dkt. 78 at 182:2–10). Following the November 6, 2018 incident, Grigsby was called into a meeting with Meline and Robinson where they gave her a three-day suspension notice pursuant to Step 3 of La Rabida's Coaching for Performance Policy. (Dkt. 101 ¶ 50.) Robinson recommended that Grigsby be terminated for this error, but HR decided to give Grigsby another chance. (*Id.*) Grigsby completed her suspension in late November 2018. (*Id.* ¶ 54.)

11

#### 4. 2019 Incidents

In early March 2019, Robinson noted that Plaintiff failed to document a patient's oxygen level during the entirety of her shift. (*Id.* ¶ 55.) Grigsby testified that she could not recall this incident but acknowledged that it is important to document oxygen during a shift. (Dkt. 85 at 170:24–171:8.) During another shift that same month, Robinson spoke to Grigsby again about copying ventilator settings from prior shifts. (Dkt. 101 ¶ 56.) During a different shift in early March 2019, Grigsby documented the wrong pressure support for a patient. (*Id.* ¶ 57; Dkt. 85 at 173:6–18.) On March 17, 2019, the ventilator pressure for one of Grigsby's patients was set to the wrong amount throughout her entire shift, contrary to the doctor's orders. (*Id.* ¶ 59; Dkt. 85 at 179:6–11.) On March 25, 2019, Grigsby incorrectly recorded the "Fraction of Inspired Oxygen" number. (*Id.* ¶ 60; Dkt. 85 at 184:10–13.) She was given an official Notice of Termination on April 4, 2019. (*Id.* ¶ 62.)

#### ii. Grigsby's Annual Performance Evaluations

In addition to Grigsby's disciplinary record, the parties rely on Grigsby's annual performance evaluations to illustrate her job performance while at La Rabida. Every year, Grigsby received annual performance evaluations, which included overall ratings "determined through a numerical process, whereby each performance category is assigned a number associated with a performance rating" and "[t]hose numbers are then tallied for an overall rating." (Dkt. 101 ¶ 28.) The ratings ranged from 1 to 5, with a score of 1 reflecting "unsatisfactory" performance and a score of 5 reflecting "outstanding" performance. (*See* Dkt. 85 at 118). For each annual performance evaluation, Grigsby was given the opportunity to make any comments in response to the evaluation. (Dkt. 101 ¶ 28.)

As Grisby's supervisor, Robinson completed Grigsby's annual performance evaluations from 2013 to 2019. (*Id.*) The parties mainly focus on Grigsby's performance evaluations for 2016 to 2019; the Court therefore only briefly summarizes her 2013 to 2015 evaluations. For her 2013 performance review, Grigsby received an overall rating of "Meets Expectations" and a rating of "Below Expectations" in the category of "Observing Policies." (*Id.* ¶ 30.) For her 2014 performance review, Grigsby received an overall rating of "Outstanding." (*Id.* ¶ 31.) For her 2015 performance review, Grigsby received an overall rating of "Exceeds Expectations"; Robinson also noted that Grigsby "must add critical thinking aspect to her interventions." (*Id.* ¶ 32.) Grigsby signed those above evaluations and made no comments in response. (*Id.* ¶¶ 30–32.)

On Grigsby's 2016 performance review, Robinson gave Grigsby an overall rating of "Meets Expectations." (*Id.* ¶ 33.) Under the "Job Knowledge" category, Robinson wrote that "balancing 'tasks' with 'critical thinking' will be key to improvement in this area." (*Id.*) She also wrote that Grigsby must keep up with changes in the equipment and noted that Grigsby struggles with adjustments to procedures. (*Id.*) Robinson remarked that Grigsby was one of the more "senior" employees in the department (as she had worked for the department since 2008), but that she had developed a routine approach to her responsibilities. (*Id.* ¶ 34.) She recommended that Grigsby add critical thinking to her inventions and embrace changes within the department. (*Id.*) Grigsby signed the performance evaluation and made no comments in response. (*Id.*)

On Grigsby's 2017 performance review, Robinson gave Grigsby an overall rating of "Meets Expectations." (*Id.* ¶ 36.) Robinson reiterated that Grigsby had developed a routine approach to her duties and noted that she needed to add critical thinking to her workflows and to address misunderstandings immediately. (*Id.*)

13

On Grigsby's 2018 performance review, Robinson gave Grigsby an overall rating of "Meets Expectations." (*Id.* ¶ 42.) Robinson and Grigsby signed the 2018 evaluation on March 13, 2018, the same day that they signed Grigsby's above-mentioned PIP. (*Id.* ¶ 43; Dkt. 85 at 168, 171.) In the areas of "Job Knowledge," "Work Quality," and "Job Duty: Patient care," Robinson rated Grigsby's performance as "Below Expectations." (Dkt. 101 ¶ 42; Dkt. 85 at 163–65.) Robinson's comments reiterated that Grigsby had developed a routine approach to her responsibilities and that she must employ critical thinking and embrace departmental changes. (Dkt. 101 ¶ 42.) Grigsby signed the performance evaluation without any comments in response. (*Id.*)

On Grigsby's 2019 performance review, Robinson gave Grigsby an overall rating of "Meets Expectations." (*Id.* ¶ 58.) She rated Grigsby's performance as "Below Expectations" in the categories of "Respecting Fellow Employees," "Job Knowledge," "Work Quality," and "Patient Care." (*Id.*; Dkt. 85 at 214–16.) Robinson wrote that Grigsby "makes frequent errors with charting . . . . Critical thinking has not become part of her workflow" and that Grigsby "does not catch and correct her own errors." (Dkt. 85 at 214.) Robinson repeated her prior criticism that Grigsby employs a routine approach to her duties and wrote, "Her overall performance meets expectations, however, the areas scored below expectation are critical to providing safe patient care. It is essential for Eva to acknowledge the noted areas of improvement opportunities, review all documentation to catch and correct errors to prevent patient harm." (*Id.* at 218.) Grigsby refused to sign her 2019 performance evaluation on March 12, 2019, a few weeks before she was terminated. (*Id.* at 219; Dkt. 101 ¶ 62.) Grigsby also provided no comments in response to her evaluation. (Dkt. 85 at 219.)

### e. Grigsby's Termination

On April 4, 2019, Grigsby's employment with La Rabida was officially terminated after Robinson sought and received approval from HR. (Dkt. 101 ¶¶ 61–62.) In seeking approval for Grigsby's termination, Robinson sent HR an email with a summary of corrective or disciplinary action taken against Grigsby. (*Id.* ¶ 61.) Grigsby's Termination Notice stated that she was being terminated for unsatisfactory work performance and that she had major policy violations including "[i]nappropriate care of patients, patient abandonment, verbal and/or physical abuse, or neglect." (Dkt. 85 at 230.) The Notice further stated under "Other Rule Violations": "[c]arelessness, unreliability, and failure or refusal to adhere to Hospital and department standards, policies and procedures"; "[v]iolation of departmental rules, standards and policies"; and "[m]isconduct, including, but not limited to gross negligence or any conduct that is in conflict with and/or jeopardizes the well being of La Rabida, patients or any individual an employee may come into contact with through the delivery of service." (*Id.*) Grigsby testified that no one called her to tell her that she was terminated and that the Termination Notice was the only communication she received regarding her termination. (*Id.* at 186:9–14.)

## III. Procedural History

Grigsby initiated this action on January 3, 2020, bringing claims under Title VII, the ADEA, and § 1981, and for defamation. (Dkt. 1.) Grigsby amended her complaint on January 5, 2021, to allege claims only under Title VII, the ADEA, and § 1981. (Dkt. 25.) Grigsby alleges that Meline and Robinson discriminated against her based on her race and her age, and that Robinson created a hostile work environment through her harassment of Grigsby. (*See generally id*.) Fact discovery was completed as of August 16, 2022. (Dkt. 68.) Defendants subsequently

filed their motion for summary judgment on all of Grigsby's claims, which the Court now considers. (Dkt. 82.)

## Legal Standard

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone, but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture.'" *Grant v. Trs. of Indiana Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

16

## Discussion

Grigsby brings claims under the ADEA, Title VII, and § 1981, alleging that Defendants discriminated against her based on her age and race and created a hostile work environment. Defendants have moved for summary judgment on each of Grigsby's claims. The Court first discusses Grigsby's discrimination claims.

## I.  Age and Race Discrimination Claims

Grigsby asserts that her termination from La Rabida was a result of age and race discrimination on the part of Meline and Robinson. When analyzing an employment discrimination claim at the summary-judgment stage, "the critical question is whether the plaintiff has produced enough evidence to permit a reasonable factfinder to conclude that the plaintiff's race or other proscribed factor caused the adverse employment action." *Chatman v. Bd. of Educ. of City of Chicago*, 5 F.4th 738, 746 (7th Cir. 2021) (citation omitted).

When assessing an employment discrimination claim, "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). Following *Ortiz*, a plaintiff may choose whether to employ this holistic approach or present his or her evidence using the traditional, burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Chatman*, 5 F.4th at 746; *Kotoklo v. DePaul Univ.*, No. 20-CV-0635, 2021 WL 4477947, at *12 (N.D. Ill. Sept. 30, 2021).

Under the *McDonnell Douglas* approach, a plaintiff can state a prima facie case of employment discrimination by showing that "(1) she is a member of a protected class, (2) she was meeting the defendant's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees who were not members of her protected class were treated more favorably." *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 661 (7th Cir. 2016). If

the plaintiff establishes a prima facie case, the burden then shifts "to the defendant to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Id.* (citation omitted).

The parties have analyzed Grigsby's race and discrimination claims under both *McDonnell Douglas* and *Ortiz*. The Court therefore applies both approaches, beginning with Grigsby's ADEA discrimination claims.

### a.  ADEA Discrimination Claims

"[T]he ADEA makes it unlawful for an employer 'to fail or refuse to hire . . . any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age.'" *Chatman*, 5 F.4th at 746 (citing 29 U.S.C. § 623). Specifically, "[t]he ADEA protects workers who are forty years old and older from discrimination based on age." *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022). The Court ultimately concludes that Grigsby has failed to provide sufficient evidence—under either *McDonnell Douglas* or *Ortiz*—to create a genuine dispute of material fact as to whether she was terminated due to her age.

### i.  *McDonnell Douglas* Analysis

Neither party disputes that the first and third elements of the *McDonnell Douglas* framework are met here: termination is an adverse employment action and Grigsby was over forty years old at the time of her termination and is thus a member of a protected class. *See Han v. Whole Foods Mkt. Grp., Inc.*, 44 F. Supp. 3d 769, 787 (N.D. Ill. 2014) ("There is no dispute that Han's termination was an 'adverse action[.]'"). The parties instead focus on the second and fourth elements: whether Grigsby was meeting Defendants' legitimate expectations and whether

she has identified any similarly situated employees, not in her protected class, who were treated more favorably. The Court addresses these arguments in turn.

### 1. Legitimate Expectations

The parties' foremost dispute is whether Grigsby met La Rabida's legitimate expectations. Defendants argue that they terminated Grigsby because her job performance was deficient. (Dkt. 83 at 11.) In response, Grigsby points out that she never received a rating lower than "Meets Expectations" on her annual performance reviews and contends that she was disciplined for mistakes that were commonplace throughout the department. (Dkt. 100 at 8–9.)

The Court concludes that Grigsby has failed to show a genuine dispute of material fact as to whether she met La Rabida's legitimate expectations at the time she was terminated. The record indicates that Grigsby's work quality was lacking and that she failed to improve her performance despite being given multiple opportunities to do so. Throughout 2018 and 2019, Grigsby made a series of errors—most of which she does not dispute (or at least, does not dispute properly). In March 2018, Robinson placed Grigsby on a PIP that conformed with the performance areas in which she was receiving low scores. Grigsby's PIP specified that Grigsby needed to focus on preventing further documentation errors. Grigsby nevertheless was suspended in November 2018 after she misinformed a resident physician of a patient's ventilator settings and recommended that the patient's air pressure be increased; Robinson testified that this type of mistake could be fatal. (Dkt. 78 at 182:2–10.) Grigsby made several more documentation mistakes in 2019 before she was officially terminated. The evidence thus demonstrates that Grigsby's job performance was inadequate and likely dangerous.

The Court is not persuaded that Grigsby's overall rating of "Meets Expectations" on her annual evaluations is enough for a reasonable factfinder to conclude that she was nevertheless

19

meeting Defendants' legitimate expectations at the time of her termination. On Grigsby's 2018 and 2019 evaluations, she received a rating of "Below Expectations" in several performance areas, including "Patient Care," "Job Knowledge," and "Work Performance." As stated above, her PIP was tailored to address her deficient performance in these areas, and she was suspended after she made a critical error. On Grigsby's final performance evaluation, Robinson also acknowledged that while Grigsby's "overall performance meets expectation . . . the areas scored below expectation are critical to providing safe patient care" and it was "essential for [Grigsby] to acknowledge the noted areas of improvement opportunities, review all documentation to catch and correct errors to prevent patient harm." (Dkt. 85 at 218.) Grigsby's annual reviews—and her overall rating of "Meets Expectations"—reflect that Grigsby did well in some areas and poorly in others, but "[m]eeting or even exceeding expectations in one job function does not negate deficiencies in other job functions." *Hopkins v. Bd. of Educ. of City of Chicago*, 73 F. Supp. 3d 974, 992 (N.D. Ill. 2014)*. The evidence in the record that Grigsby establishes that Grigsby was failing to meet La Rabida's legitimate expectations in several critical aspects of her job. *See id.* ("Hopkins' teaching awards for student performance on spelling bees, standardized tests, and school attendance do not negate the Board's findings of unprofessional conduct and verbal abuse."); *Fortier v. Ameritech Mobile Commc'ns, Inc.*, 161 F.3d 1106, 1114 (7th Cir. 1998) ("[Plaintiff's supervisor] was entitled to determine that the deficiencies in his performance outweighed [his] accomplishments.").

Grigsby also points out that she received a merit increase. (*See* Dkt. 100 at 12). But her merit increase does not change the Court's conclusion that she failed to meet La Rabida's expectations. Meline sent an email in October 2018, about processing Grigsby's merit increase, (Dkt. 80 at 133), but Grigsby was suspended in November 2018. Additionally, Grigsby made

several other mistakes in 2019 following her suspension. Given her continuing record of poor performance following her merit increase, her merit increase is of limited relevance or import. *See Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021) ("'[T]he issue is not the employee's past performance but 'whether the employee was performing well at the time of [his] termination.'") (citation omitted).

Grigsby further quibbles about the nature of her mistakes, asserting that they were, in fact, typical and minor, but her attempts to downplay her errors are unavailing. First, she repeatedly characterizes her mistakes as merely "clerical errors." As the Court understands this distinction, Grigsby is asserting that she did not change ventilator settings, but only recorded their numbers incorrectly. The Court notes, however, that there was one instance where Grigsby told a resident physician to increase the air pressure based on the wrong ventilator setting. Grigsby also provides no compelling reason as to why a respiratory therapist's documentation error should be treated as less grave. Her testimony instead suggests that maintaining proper documentation is important. (*See, e.g.*, Dkt. 85 at 171:6–8) (agreeing that it is important to document oxygen during a shift).

Grigsby further argues that she was "merely following the doctor's orders" when documenting ventilator settings, but this statement is contrary to record evidence. (Dkt. 100 at 7 (citing Dkt. 112 ¶ 9).) For example, Grigsby testified that in March 2019, although a doctor had set the FiO2 to be at 28, she erroneously documented the FiO2 as 25. (Dkt. 85 at 183:20–184:20.)

Lastly, as discussed further below, Grigsby's argument that her mistakes were typical within the department is largely immaterial to her discrimination claims absent accompanying evidence that others were not similarly disciplined or penalized. Accordingly, Grigsby has failed

21

to show a genuine dispute of material fact as to whether that she was meeting Defendants'
legitimate expectations at the time of her termination.

## 2. Similarly Situated Individuals

Grigsby next claims she can identify similarly situated individuals not in her protected
class who were treated more favorably than her. (Dkt. 100 at 7.) She claims that Robinson
showed preferential treatment towards the younger dayshift and specifically points to Marren
Culberson and Rachel Beasley as individuals who were not part of her protected class but were
allowed to correct their mistakes and were not harassed by Defendants. (*Id.*)

Grigsby cannot rely on the dayshift generally or Beasley individually as proper
comparators for her age-discrimination claim. First, a plaintiff "must identify specific employees
that are similarly situated," and "general references to similarly-situated employees" will not
suffice. *Bragg v. Caterpillar Inc.*, No. 09 C 7102, 2011 WL 1131325, at *7 (N.D. Ill. Mar. 28,
2011). Second, Beasley is an African American woman who was in her forties at the time of the
relevant events; she is therefore a part of Grigsby's protected class. (Dkt. 81 ¶ 9.) *See Jordan v.
City of Gary, Ind.*, 396 F.3d 825, 833 (7th Cir. 2005) (holding plaintiff had failed to state a prima
facie case of discrimination because her comparator was in the same protected class as her: an
African American female over the age of 40).

Grigsby also cannot use Culberson as a comparator because she lacks evidence that
Culberson was similarly situated to her or received favorable treatment. "[W]here the plaintiff
alleges the employer disciplined him more harshly than his comparator, 'the most relevant
similarities are those between the employees' alleged misconduct, performance standards, and
disciplining supervisor[.]'" *de Lima Silva v. Dep't of Corr.*, 917 F.3d 546, 559 (7th Cir. 2019).
"The critical question is whether the employees have engaged in conduct of comparable

seriousness"—for example, whether their conduct "violates the same rule or is of a similar nature." *Id.* (cleaned up). Grigsby offers no evidence that Culberson committed any of the same mistakes that she committed or that he was not disciplined or reprimanded for the same mistakes as her. Grigsby's argument, instead, rests on her testimony that the whole department made similar documentation errors but the other therapists were permitted to correct their mistakes. (Dkt. 100 at 7 (citing Dkt. 112 ¶ 14; Dkt. 85 at 190:7–191:5).)

This evidence is unpersuasive for two reasons. First, Grigsby testified that Culberson often passed out papers to therapists to inform them of mistakes they had made and to remind them to correct their mistakes, but he never gave Grigsby a piece of paper. (*Id.* at 190:23–191:5.) Grigsby, however, did not testify that Culberson was one of the individuals who made similar mistakes to herself and was given the chance to correct them. Further, when asked to specify which individuals made similar errors but were not disciplined, Grigsby did not name any particular individual but responded that most of the people had left. (*Id.* at 190:21–23.)

Second, Grisby's testimony reveals nothing about her personal knowledge of the nature of other people's mistakes or whether others were also disciplined for their errors. Grigsby therefore cannot use this testimony as evidence of favorable treatment. *See Simpson*, 827 F.3d at 662 (holding plaintiff failed to state a prima facie case of discrimination because she "did not submit admissible evidence of other nurses receiving favorable treatment—i.e., not being disciplined after engaging in misconduct—nor did [plaintiff] supply a foundation for the contention that she . . . [has] personal knowledge of the alleged misconduct and the defendant's reaction. Instead, [plaintiff] presented only vague, conclusory assertions about incidents outside her personal knowledge." (citations omitted)).

The only other evidence that Grigsby provides to suggest that other employees were treated favorably is an email exchange between Aden Henry, the Vice President of Patient Care Services, and Pat DiFiglio, wherein Henry states that the use of the recall button capability should ultimately be stopped. (*See, e.g.*, Dkt. 101 ¶ 37; Dkt. 80 at 72.) But Grigsby's errors were not limited to using the recall button, and, critically, the email does not say whether others were disciplined for using the recall button or not. This email therefore also does not help her establish a prima facie case of age discrimination. The Court therefore concludes that Grigsby has failed to identify any similarly situated individual not in her protected class that was treated more favorably.

As Grigsby has failed to meet two elements of the *McDonnell* analysis, Grigsby has failed to shift the burden onto Defendants, and the Court need not separately address whether her termination was pretextual. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 331–32 (7th Cir. 2002) ("Because Peele has failed to establish *prima facie* cases of sex and age discrimination, we need not address her pretext argument."). The Court instead evaluates Grigsby's age-discrimination claims and the evidence in the record under the *Ortiz* approach.

### ii. *Ortiz* Analysis

Under *Ortiz*, courts "ask whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki*, 988 F.3d at 958. Plaintiffs may use direct or circumstantial evidence to support an inference of intentional discrimination. *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 929 (7th Cir. 2020). For example, plaintiffs may submit evidence of "ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Id.* At bottom, the "determinative question" is "whether the evidence would permit a reasonable

factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Igasaki*, 988 F.3d at 958 (quoting *Ortiz*, 834 F.3d at 765).

Grigsby argues Defendants terminated her due to her age based on the following evidence: (1) disparate disciplinary treatment; (2) age-based comments; (3) Grisby's accusation that Robinson falsified Grigsby's disciplinary file; and (4) Grigsby's allegations that Defendants failed to follow La Rabida's disciplinary policy. The Court discusses each piece of evidence before assessing the record as a whole.

### 1. Disparate Disciplinary Treatment

The Court rejects Grigsby's assertion that she was subject to disparate disciplinary treatment for the reasons stated above. To briefly reiterate the Court's reasoning, Grigsby has failed to demonstrate that she was meeting La Rabida's legitimate expectations at the time of her termination and she has failed to identify a similarly situated individual that was treated more favorably. Specifically, she has provided no evidence that other employees made and were not disciplined for similar mistakes. Put simply, the record does not support Grigsby's claim that she was treated differently or more punitively than any other employee in her department.

### 2. Robinson's Age-Based Comments

Grigsby contends that Robinson's references to Grigsby as a "Golden Girl" and a "senior therapist" make it reasonable to infer that Grisby suffered age discrimination. However, the Court finds that a reasonable factfinder could not conclude based on those comments that Grigsby was terminated because of her age. With respect to Robinson's use of the term "senior therapist," Grigsby's assertion that the term "senior" refers to her age strains credulity. Grigsby testified that she had more seniority than a lot of her co-workers in her department, and she

acknowledged that Robinson's use of the word "senior" on her 2016 performance review was a reference to her seniority in the department. (Dkt. 85 at 69:17–20; 112:19–113:2.) Based on this, the Court finds that inferring the term "senior therapist" to be an age-related comment, as opposed to a remark about the length of Grigsby's employment on La Rabida, borders on unreasonable. *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 730 (7th Cir. 2014). ("[W]e make only reasonable inferences, not every conceivable one.").

In any case, the terms "Golden Girl" and "senior therapist" are not necessarily indicative of age bias or suggestive of animus. As mentioned above, the term "senior therapist" could instead reflect that a therapist is more mature or knowledgeable. *See Lindsey v. Walgreen Co.*, No. 08 C 3547, 2009 WL 4730953, at *4 (N.D. Ill. Dec. 8, 2009) ("Jenkins' statements are not necessarily discriminatory and speak more to Plaintiff's maturity than to any age bias on the part of Jenkins."). With respect to the "Golden Girls" comments, Grigsby argues that "it is objectively offensive to name a woman, or group of women after a comedy television show which makes light of the struggles women face as they age." (Dkt. 100 at 11.) Without delving into a discussion of the Golden Girls' depiction of age, the Court finds that Robinson's use of the term could be taken as "simple teasing" or even a term of endearment. *See Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 900 (7th Cir. 2018) ("Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." (citation omitted)); *see also Martino v. MCI Commc'ns Servs., Inc.*, 574 F.3d 447, 452 (7th Cir. 2009) (noting that the term "oldtimer" does not appear to be an inherently offensive term and could, instead, be a term of endearment). Moreover, when asked in her deposition why she felt that Robinson's "Golden Girl" comment was negative, Grigsby gave a non-responsive answer: "The Golden Girls, like the Golden Girls on TV." (Dkt. 85 at 73:8–18.)

Grigsby further fails to provide any evidence that Robinson's comments were made in connection to her termination. *See Schreiner v. Caterpillar, Inc.*, 250 F.3d 1096, 1099 (7th Cir. 2001) ("[T]he comments must be related to the adverse decision. Stray workplace comments unrelated to the alleged discriminatory employment decision are not sufficient to support an inference of discrimination." (citation omitted)); *see also Perez v. Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir. 2013) ("Standing alone, biased comments do not establish discriminatory motive unless they were by the decision maker and can be connected to the decision."). Age did not come up during Grigsby's suspension or termination, and Grigsby provides no other evidence that Robinson ever made age-related comments when speaking to her about her numerous disciplinary matters. (*See, e.g.*, Dkt. 85 at 187:16–22 (Grigsby answering, "I really didn't talk to her when I got terminated" when asked whether Robinson made any comments about Golden Girls in connection with her termination); *id.* at 187:23–188:6 (Grigsby answering, "No, Tim Meline did it all" when asked whether Robinson made any comments about Golden Girls in connection with Grigsby's suspension).) The only time Robinson arguably referenced Grigsby's age in connection to performance matters was when she wrote that Grigsby was "one of the more senior employees" in the department on a performance review, and Grigsby conceded that "senior" was a reference to the length of her employment. (Dkt. 85 at 69:17–20; 112:19–113:2.) The Court therefore finds that Robinson's comments do not move the needle with respect to Grigsby's age-related claims.

### 3. Falsification of Grigsby's Personnel File

Next, Grigsby vaguely accuses Robinson of padding Grigsby's personnel file with false documentation but fails to fully develop or substantiate this argument. (*See* Dkt. 100 at 3.) As a threshold matter, Grigsby is inconsistent on this position. Grigsby claims that Robinson added

the parent's February 2018 complaint into Grigsby's file to make her look bad, yet in her responses to Defendants' Statement of Facts, Grigsby responded, "Plaintiff does not dispute that a complaint was made, but such complaint was meritless." (Dkt. 101 ¶ 39.) The veracity of the parent's complaint, however, has no bearing on whether Robinson made up reports about Grisby and put them into Grigsby's file. Similarly, Grigsby conflates the fact that she had not previously seen or could not recall certain documents in her personnel file with evidence that the documents are false. *See Onofrei v. Gen. Sec. Servs. Corp.*, No. 04 C 5560, 2005 WL 3312599, at *7 (N.D. Ill. Dec. 5, 2005) (rejecting plaintiff's argument that defendant manufactured charges against her because plaintiff only pointed to her own deposition testimony that she never saw one of the write-ups produced by defendant but did not deny that she committed the violation in the write-up and presented no evidence that document was forged). As Grigsby has provided no other evidence that Robinson falsified her disciplinary records, the Court finds this accusation to be wholly unfounded. *See Travis v. Illinois Dep't of Corr.*, No. 18-CV-00282, 2024 WL 2052067, at *8 (N.D. Ill. May 8, 2024) ("At summary judgment, Plaintiff's conclusory allegation that Defendants falsified violations as cover for racial discrimination does not hold water." (citations omitted)).

### 4. Defendants' Deviations from Disciplinary Policy

Finally, Grigsby argues that Defendants failed to follow La Rabida's four-step Coaching for Performance Policy, which makes it reasonable to infer that Defendants' termination of Grigsby was pretextual. (Dkt. 100 at 9.) "Significant, unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of discriminatory intent." *Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012). Grigsby argues that Defendants did not follow the Policy because Meline did not check whether Step 1 or Step 2

had occurred before suspending Grigsby, Grigsby was not terminated in an in-person meeting, and her Termination Notice did not contain exact citations to the employee handbook. (*See* Dkt. 100 at 9; Dkt. 112 ¶¶ 27, 29, 32.)

The Court holds that a reasonable factfinder could not conclude that Defendants failed to follow La Rabida's Coaching for Performance Policy. First, that policy did not require Meline to check that Step 1 or Step 2 has occurred before adopting disciplinary measures under Step 3. (Dkt. 85 at 108–09.) Second, the policy states that "[t]he termination action *should normally* take place during a face-to-face discussion and, thereafter, the supervisor should promptly mail a Termination Notice . . . to the employee[.]" (*Id.* at 109 (emphasis added).) The policy therefore does not necessarily require a face-to-face meeting. Finally, the policy is silent on what information a Termination Notice should include. (*Id.*) Even if these details were breaches of the policy, the Court would, in any case, not be persuaded that they constitute sufficient evidence for a factfinder to conclude that Grigsby was terminated due to her age, given the rest of the evidence in the record. *See Hanners*, 674 F.3d at 695 (finding that a particular deviation from procedures was not indicative of racial animus because it was "hardly offered as a justification for the ultimate action taken against [plaintiff]. The deviation is far more tangential and involves simply the manner in which the charge was initiated.").

Grigsby also points out that Meline resigned in lieu of termination for violating La Rabida's policies and that Robinson took a pay cut when she left La Rabida. (Dkt. 100 at 12.) Grigsby references this information to imply that Meline and Robinson left La Rabida for violating policies and that they similarly failed to follow the rules with respect to her own termination. (*Id.*) Meline, however, left La Rabida in 2022, and Grigsby has provided no evidence to suggest his departure was connected to her termination. Likewise, Grigsby's

argument that the fact that Robinson took a pay cut creates an issue of fact as to whether her departure is voluntary or related to policy violations is irrelevant. The Court therefore finds Grigsby's attempt to connect Meline's and Robinson's departures to her present case speculative.

### 5. Assessing the Evidence as a Whole

Looking at the evidence in the record holistically, the Court concludes that Grigsby has failed to demonstrate that Defendants discriminated against her based on her age.[4] Grigsby's Termination Notice explained that she was being fired because she, among other things, exhibited "[c]arelessness, unreliability, and failure or refusal to adhere to Hospital and department standards, policies and procedures." (Dkt. 85 at 230.) As stated above, Defendants have supported this with compelling evidence that Grigsby made numerous errors, that her performance did not improve after she was put on a PIP, and that she continued to make mistakes even after she was suspended. In response, Grigsby has not provided any material evidence that her age could have been the motivating reason behind her termination. As the Seventh Circuit reasoned in another ADEA case, the record instead suggests that had Grigsby "been under the age of forty, all else equal, the 'same events would have transpired.'" *Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 722 (7th Cir. 2021) (quoting *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 725 (7th Cir. 2018)). The Court therefore grants summary judgment on Grigsby's ADEA discrimination claims in Defendants' favor.

---

[4] Given the several reasons the Court already provides for this conclusion, the Court does not address every other sub-argument Defendants raise to support summary judgment, such as that Robinson was in the same protected class as Grigsby and thus there is a presumption that she did not discriminate against Grigsby, and that other comparators were treated the same as Grigsby, including one who was terminated for making similar documentation mistakes.

### b. Title VII and § 1981 Claims

The Court now turns to Grigsby's Title VII and § 1981 race-discrimination claims. "Title VII prohibits an employer from discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Smiley v. Columbia Coll. Chicago*, 714 F.3d 998, 1002 (7th Cir. 2013) (citing 42 U.S.C. § 2000e–2(a)(1)). "Section 1981 prohibits race discrimination in the making and forming of contracts." *Id.* Title VII and § 1981 claims are generally analyzed in the same manner. *Id.*

As with her ADEA discrimination claim, a plaintiff can show race discrimination by using the *McDonnell Douglas* framework or the *Ortiz* approach. *See, e.g.*, *Edmond v. City of Chicago*, No. 17 C 4858, 2024 WL 1603464, at *11 (N.D. Ill. Apr. 11, 2024). Again, "the singular question that matters in a discrimination case" is "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge." *Johnson*, 892 F.3d at 894.

The evidence in the record indicates that Grigsby's race-discrimination claims are unfounded. When asked whether she believed that her termination was motivated by her race, Grigsby testified, "I can't say about my race or my age. It's mostly my age." (Dkt. 85 at 188:7–10.) When pressed to clarify whether she had any reason to believe her termination was based on her race, Grigsby testified, "I can't say really." (*Id.* at 188:11–13.) In addition, there are problems with her claims against Robinson and Meline.

As to Robinson, Grigsby admitted at her deposition that she did not believe that Robinson discriminated against her based on her race. (Dkt. 85 at 68:7–10.) She also did not dispute Defendants' statement of fact that Grigsby "does not believe that Robinson discriminated against

her because of her race." (Dkt. 101 ¶ 65.) As Grigsby herself does not appear to believe that Robinson discriminated against her due to her race, summary judgment is granted on Grigsby's Title VII and § 1981 claims against Robinson.

With respect to Meline, Grigsby's race-discrimination claims likewise lack evidence. The Court has already found that Grigsby failed to establish a prima facie case of employment discrimination under the *McDonnell Douglas* framework. Grigsby's race-discrimination claims against Meline fail under the *Ortiz* approach too. Put simply, Grigsby has provided no evidence of race discrimination. When asked why she believed that Meline's behavior towards her was based on race, Grigsby testified that it was "just a gut feeling." (Dkt. 85 at 91:8–14.)

Grigsby's "gut feeling" seems to be based on three incidents. First, Grigsby complained to Meline that another employee had stolen her boots, and he allegedly stated that he could not do anything about the situation. (*Id.* at 88:5–24.) Second, Meline once called Grigsby into his office to follow-up on a report that another employee made about her. (*Id.* at 89:9–91:7.) Finally, Meline allegedly yelled at her at her suspension meeting after she asked for a copy of one of the documents (from her personnel file) that Meline and Robinson had brought to the meeting. (*Id.* at 91:13–93:15.)[5] While these may have been negative interactions, Grigsby points to no relevant evidence to support her "gut feeling" that Meline's behavior during these incidents was motivated by race discrimination. Accordingly, Defendants' motion for summary judgment is granted with respect to Grigsby's race-discrimination claims against Meline. *See Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) ("While [plaintiff] is entitled, as

---

[5] The Court notes that Grigsby contradicts herself when she asserts that she was never given an opportunity to look at her personnel file. (Dkt. 112 ¶ 8.) She testified that she was provided her personnel file after she asked Meline to see it following her suspension. (Dkt. 85 at 19:20–20:25.)

the nonmoving party, to all reasonable inferences in her favor, 'inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.'") *(quoting Tubergen v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 517 F.3d 470, 473 (7th Cir. 2008)).[6]

In her response brief, Grigsby requests additional discovery to obtain evidence that Defendants have a pattern and practice of discriminating against African American employees that was the but-for cause of her termination. (Dkt. 100 at 13.) This request is denied. Fact discovery lasted about one year and closed before Defendants filed their present motion. Grigsby had her opportunity to obtain the kind of evidence she currently seeks; she is essentially admitting that she failed to obtain any evidence to support her race-discrimination claims. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) ("Summary judgment is the 'put up or shut up' moment."). Grigsby also has not filed a Federal Rule of Civil Procedure 56(d) affidavit stating her reasons for needing further discovery. *OneBeacon Ins. Co. v. U.S. Foods, Inc.*, 304 F.R.D. 536, 539–40 (N.D. Ill. 2014) (outlining Rule 56(d) requirements); *Kallal v. CIBA Vision Corp.*, 779 F.3d 443, 446 (7th Cir. 2015) (holding denial of request for further discovery was warranted because movant did not submit formal affidavit and noting that an affidavit "would in any event not have guaranteed more discovery"). The Court therefore will not reopen fact discovery.

---

[6] In her responses to Defendants' Statement of Material Facts, Grigsby also attempts to rely on evidence relating to Meline's own departure from La Rabida as proof of Meline's general racial animus. She argues that a factfinder could adduce Meline's racial animus from the fact that Meline did not have problems with his former supervisor, who was also white, but he had problems communicating with his new supervisor, who was Hispanic. (Dkt. 101 ¶ 74.) The Court finds this evidence irrelevant and Grigsby's argument speculative. The question courts are tasked with answering is whether there is enough evidence for a reasonable factfinder to conclude that a plaintiff's race caused her termination. *See Ortiz*, 834 F.3d at 765. Evidence that Meline did not get along with his new supervisor, who was a different race than him, is insufficient to create a genuine dispute of material fact as to whether race played a role in Grigsby's own termination.

## II.       Hostile-Work-Environment Claims

Lastly, the Court addresses Grigsby's hostile-work-environment claim. A work environment becomes hostile when "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Brooks*, 39 F.4th at 441 (citation omitted). The Seventh Circuit has assumed, without deciding, that plaintiffs can bring hostile-work-environment claims under the ADEA. *Id.* A plaintiff bringing a hostile-work-environment claim must show that "(1) she was subject to unwelcome harassment; (2) the harassment was based on disability or age or another protected category; (3) the harassment was sufficiently severe or pervasive, both subjectively and objectively, so as to alter the conditions of her employment and create a hostile or abusive atmosphere; and (4) there is a basis for employer liability." *Id.*

Grigsby contends that she suffered age-based harassment in the form of Robinson's repeated references to her and other older respiratory therapists as the "Golden Girls" and as "senior therapists." (Dkt. 100 at 10–11.) She further asserts that she was singled out for discipline and training and her work quality was repeatedly questioned, even though her performance met expectations. (*Id.* at 11–12.)

Courts determine whether harassment is objectively offensive by considering "the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or humiliating or merely offensive, and whether it unreasonably interferes with an employee's work performance." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 712 (7th Cir. 2017). The plaintiff must provide evidence of more than "[m]ere 'personal animosity or juvenile behavior' by coworkers." *Tyburski v. City of Chicago*, 964 F.3d 590, 602 (7th Cir. 2020)

34

(quoting *Brown v. Advocate South Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012)). "Even insults specifically referencing age do not necessarily rise to the level of actionable harassment." *Id.*

The Court concludes—mainly for the reasons stated in prior sections—that a reasonable factfinder could not conclude that Robinson's alleged harassment was objectively offensive. As already discussed, the Court does not credit Grigsby's assertion that Robinson was referring to her age when she called Robinson a "senior therapist." The Court also finds that Robinson's reference to the Golden Girls is not sufficiently severe—it is facially innocuous rather than inherently offensive or derogatory. *See also Johnson*, 892 F.3d at 900 ("We expect a certain level of maturity and thick skin from employees . . . . [S]imple teasing [does] not rise to the level of conduct that alters the terms and conditions of employment."). Grigsby argues that the referenced television show makes "light of the struggles women face as they age." (Dkt. 100 at 11.) But other courts have found similarly neutral—and even more explicitly offensive—references to a plaintiff's age to be insufficiently severe to support a hostile-work-environment claim. *See, e.g.*, *Cover v. OSF Healthcare Sys.*, 697 F. Supp. 3d 803, 812 (N.D. Ill. 2023) (finding use of the phrase "old man" was insufficient for actionable harassment); *Brooks*, 39 F.4th at 441–42 (finding general references to comments that plaintiff was "old and slow" were insufficient to create a hostile work environment).

Further, Grigsby provide no specific evidence that Robinson's "Golden Girl" comments interfered with her work performance. At most, Grigsby contends that "the offensive nickname given to her eventually became her moniker." (Dkt. 100 at 11.) But she does not fully develop how having a purportedly hurtful nickname obstructed her ability to conduct her work. *See Evans v. Illinois Dep't of Hum. Servs.*, No. 15 C 4098, 2017 WL 2590754, at *5 (N.D. Ill. June

15, 2017) (finding plaintiff's claims that she "struggle[d] to get work done" and that she was "affected both physically and emotionally by the bullying, harassment, and discrimination," without more, did not establish that the allegedly harassing comments impacted her work performance). The Court therefore concludes that Grigsby has failed to show a genuine dispute of material fact as to whether her alleged harassment was objectively severe.

Lastly, Grigsby's alleges that she was harassed by being disproportionately disciplined and singled out cannot be the basis of her hostile-work-environment claim.[7] As the Court has already explained, Grigsby has provided no evidence substantiating those assertions, especially given the evidence in the record reflecting her poor performance. Grigsby also cites no evidence suggesting that those alleged actions were based on her age. The Court therefore grants summary judgment on Grigsby's hostile-work-environment claim in Defendants' favor.[8]

## Conclusion

For the foregoing reasons, the Court grants summary judgment in Defendants' favor on all of Grigsby's claims. Civil case terminated.

**SO ORDERED.**                                            **ENTERED: August 27, 2024**

_____
**HON. JORGE ALONSO**
**United States District Judge**

---

[7] Grisby also points to the circumstances surrounding Meline's and Robinson's departures from La Rabida as support for her hostile-work-environment claim. (Dkt. 100 at 12.) As stated above, Grigsby's reliance on this evidence is speculative and immaterial to her claims against Defendants.
[8] As the Court finds that Grigsby failed to produce enough evidence to defeat summary judgment, the Court need not address Defendants' _Faragher-Ellerth_ affirmative-defense argument. (_See_ Dkt. 86 at 15.)